Good morning. May it please the Court, Jonathan Libby appearing on behalf of Appellant Timothy Wilkins. Your Honor, Mr. Wilkins has raised two claims on appeal, either of which would entitle him to habeas relief, and I will attempt to address both claims in my limited time and try to reserve a little time for rebuttal. Unless the Court has a preference, I'll begin with the Sixth Amendment claim, which is that Mr. Wilkins was denied his right to counsel at a critical stage of his criminal proceedings when his trial attorney, Nancy Sperber, refused to participate in his trial examination, forcing him to testify in the narrative, even though she had no idea whether or not Mr. Wilkins intended to commit perjury. Why do we make of her letter that she wrote saying, in effect, she really didn't believe the story, you don't think that is a sufficient showing to satisfy these under AEDPA standards? I do not, Your Honor. And specifically, under AEDPA, one of the failings of the State court here, if we're going to look at whether there was an unreasonable application of clearly established law, under Strickland, we have a two-prong approach. The Court jumped to step two, prejudice, and said, well, there's no prejudice here. The problem is prejudice would be presumed if, in fact, Mr. Wilkins was denied his right to counsel at this critical stage. Now, he would only be denied his right to counsel if, in fact, she knew he was going to commit perjury. I mean, she was – the State of California has said, the Supreme Court of California has said that in order for a trial attorney to essentially withdraw from representation during this critical stage and have the defendant testify in the narrative, defense counsel has to have – has to actually know that the defendant is going to commit perjury. How can anybody ever know that? Well, what the California Supreme Court has said is essentially, if based on the facts known to counsel or the defendant's own statements to counsel indicate that defendant intends to commit perjury, then – That's a different story. You said that she must know that he's going to commit perjury. And that would be the only way that counsel, in fact, could know, that defense – that defendant, in fact, has said, I'm going to commit perjury. Or I'm going to tell the story and based on – Normally he says to his lawyer – he has discussions with his lawyer, which are confidential, and the lawyer then surmises. And that's about the best the lawyer can do ever, isn't it? Well, what the California Supreme Court has said is she – counsel must have a firm factual basis for this belief, okay? And here, there was no firm factual belief expressed by counsel. All – I mean, counsel said nothing, in fact, to the court at the time. And the court made no inquiry to counsel. The court essentially made an assumption that she believed he must intend to commit perjury, but there was no inquiry made. We do know from her letter that – and she, in fact, had no idea what he was going to testify to. I mean, she was essentially – I mean, understand the background here. Defense counsel had attempted to withdraw from representation on the eve of trial and expressed to the court she couldn't get along with Mr. Wilkins. Whose – whose objection? Beg your pardon? Who objected? The client. The defendant did, absolutely. Absolutely. So what you're saying – I mean, what's the significance of what you're saying to us? Well, the significance is because Ms. Berber – she was not communicating with the defendant, okay? And she indicated she couldn't guarantee the court she was going to do her best. She didn't really want much to do with Mr. Wilkins. Where did she say, I can't guarantee the court that I'm going to do my best? She says that, Your Honor. She's going to do her best. She just can't make the man say what he's – what the truth is. Your Honor, at excerpts of record, page 211 to 212. She asked to withdraw. There's no doubt about that. And the person who objected to her withdrawal was not the court. It was your client. I'm sorry. Is that actually page 219, Your Honor, where she says, because of my feelings about Mr. Wilkins and the way he behaves, I do not feel I can give him my best in representing him. So counsel already said she can't do her best. And counsel's not communicating with him. And clearly there's a breakdown. And, yes, he wanted to continue, but she needed to still have a firm factual basis for believing he intended to commit perjury. And what she says here after the fact is, I couldn't talk to him. I had no idea what he was going to say. So I just figured he might commit perjury, so I'm going to have nothing to do with it. He has given me a series of different stories. That's right. Okay. So that implies that he's changing his story to her and telling different things. Now, they can't all be truthful, right? Perhaps, perhaps not. Well, I mean, we don't know. Under this record, you think they all were truthful? We don't know, Your Honor. You know, you want to represent this person, and you want to do your best. And you can't do your best if you mistake the record to us. How am I mistaking the record, Your Honor? You said she didn't know this or another. Well, she didn't. In fact, she had never heard the testimony that he gave on the stand. That's correct. She said afterwards that was the first time she'd ever heard it. Isn't that what this record shows? That's exactly right. And there's nothing to indicate, in fact, that the testimony he gave on the stand was, in fact, perjurious. But it wasn't what he had told her at any other time during her discussion with him. But the issue, Your Honor, with respect, is did she know in response to the perjury? I'm going to stop because we aren't going to communicate. Well, that's perhaps true, Your Honor. But she, in fact, said she didn't know. Okay. Now, what would you have had happen? What should have happened? She should have done her job, Your Honor. She should have called Mr. Wilkins to the stand. Even though when she told the court, she said, the defense he wants to present is, in my opinion, legally inappropriate and basically ludicrous and unsubstantiated. That's what triggered the trial court's ruling and allowing the narrative. That's correct. All right. Now, what should have happened? Well, she was still obviously responsible for profits. She had to say something more. She had to say something more. She should have said unsubstantiated, and I think it would be a lie. Well, actually, we're addressing these at different parts of the record in which she's saying these different things. You know, yes, she thought that in prior discussions, he basically had given a crazy theory, which I believe was something to the effect of this was a prostitution business, and that that perhaps should make a difference. That's what she was referring to. But he was just there as a customer, and he had run out. Well, the fact that whether he was a customer or not, that's, in fact, perfectly reasonable. I mean, I don't think that's what she was referring to. Right. And he, in fact, gave up and did make his statement, which, in fact, again, there's nothing to indicate that, in fact, was pejorious. The fact is she didn't know, and it was improper for her to essentially withdraw from representation. Counsel can't just say, you know, I have no idea what my client is going to say. He has the right to testify, but, you know, I don't know what he's going to say, so I'm just going to say, fine, that's on you. She otherwise represented him. I mean, she didn't absolutely withdraw. He gave his narrative testimony, but she represented him before and after. Before and after, but not during that critical stage. You know, and the Supreme Court has recognized, you know, leaving a defendant to kind of languish there on his own to give a narrative statement, you know, that is inherently prejudicial because he doesn't know what he has to say. Kennedy. The Supreme Court has said that stepping aside just for the narrative type of circumstance here is the equivalent of complete abandonment? No. But I would submit that under the first prong of Strickland, counsel must be under the prevailing professional norms. The State Supreme Court has said in California the professional norm is you must, in fact, know before you can, in fact, do this. Counsel, how does that square with Nix v. Whiteside, which is a U.S. Supreme Court case? Well, Nix v. Whiteside essentially says there's no right to testify falsely, and that's certainly true. But I'm not sure that that necessarily has that much relevance here. She did not know he was going to testify falsely. But that gets back to what Judge Ferris was talking about. I mean, you're postulating something that's, frankly, preposterous. How do you – how does a lawyer deal with this in the real world? You cannot know in advance exactly what somebody is going to say, but if you have a 99 percent certainty they're going to testify falsely, you're saying you can't act on it because you don't know exactly what they're going to say until they say  I believe that what the California Supreme Court has said is you must have a 100 percent belief, not 99 percent. And what's your authority for that? Well, the fact that the State Supreme Court in real, people v. real, said that it's not enough that you suspect or think. You must know. They italicized, by the way, the word no. The defense counsel must know that he intends to commit perjury. That would be my authority, Your Honor. With respect, if I can, just turn to the Fourteenth Amendment prison garb issue. Under Stelle v. Williams, the Supreme Court has clearly said the defendant has the right not to appear in prison garb in his trial. Here, the defendant specifically asked the Court not to have to appear in prison garb. And he was given an opportunity to get prison – I mean, get – With respect, Your Honor, he was not. He asked for it. At the first trial, what the State court basically said was there was a minute order from the first trial where the first judge, who was a different judge, said there's trial clothing available. As it happens, it's not in the record. He did appear in civilian clothing. The Court provided him with civilian clothing in the first trial. And, in fact, he makes, other than his shoes, he makes reference to that in the record in his matters of concerns, how he had to appear in jail shoes. That's at Excerpt 136. But he appeared in civilian clothing otherwise. The Court provided that to him. The second trial, he made the request before trial. The Court didn't provide it to him. This Court has said it is the obligation of the Court to provide the clothing if the defendant is indigent. The defendant here clearly is indigent. There's no dispute over that. And it's not – and it wasn't for the family to provide it, because, well, the family is indigent, too. We don't know if the family had clothing to provide to him. The fact is this Court in Feltz and in Bentley has made clear an accused was forced to stand trial in prison guard because of financial inability to obtain other attire is under a compulsion equal to that of a prisoner who was not allowed to don readily available civilian attire. The Bentley case, by the way – You're over time. We have a point. Thank you. Thank you, Your Honor. Good morning, Your Honors. First may it please the Court, Deputy Attorney General Herb Teddeff on behalf of Respondent. With respect to the Sixth Amendment issue, the question here is whether the State courts unreasonably applied or contradicted Supreme Court precedent in determining that counsel was not ineffective for allowing her client to testify in the narrative when he believed that he was going to commit perjury. And as I think the Court has already indicated, the record is clear that she believed he was going to commit perjury. We have a letter from counsel in the record that indicates that she didn't know exactly what he was going to say, but that he believed it was going to be perjurious, that he had told her many different stories. Counsel, what's your response to your opposing counsel's statement that the real case, the California Supreme Court case, says that counsel must know, bold know, in advance exactly what's being said in order to rely upon the to be committed perjury withdrawal defense, if you will? Well, I have a few responses. First of all, with respect to obtaining habeas relief under the ADBA, the question of what the California Supreme Court has stated is really not the issue. Rather, it's whether the United States Supreme Court has set a certain standard. It is true that the state courts have required a certain showing, or the California courts have required, and I believe in real, they also talk about a firm factual showing, but of course, I believe as the Court has indicated, in the real world, counsel can never know with certainty that her client is going to commit perjury. In fact, even in the Nix case, while there was certainly a very strong inference giving statements from the defendant that he was going to commit perjury, there, I don't think there was any, you know, evidence that overwhelmingly showed he was going to commit perjury. An attorney has to look at all the factors and make assumptions. And in this case, in fact, the letter from counsel shows that she said to him, I believe you're going to commit perjury. And his response was, I dare you to put me on the stand. It seems clear under those circumstances what was happening was he was going to go up and tell a story. He was daring his client to put her on the stand. And under Nix v. Whiteside, she certainly acted ethically under the circumstances in not questioning him. What's more, I would dispute counsel's representation that she was, or argument that she was not, in fact, representing her client at this time. She was in court. She was representing him. She simply was not eliciting his testimony. But in all other respects, she was acting as his counsel. Kennedy, where did she say that he dared her? As I read her letter, she said, I had concerns that he would commit perjury and would not participate in that type of conduct. He basically dared me to refuse to participate. Yes, Your Honor. I'm sorry, Your Honor, that was my intent was to point out that he basically dared her to refuse not to ask him questions. Well, that's a little different. That's not. I'm sorry, Your Honor. I got the impression you're suggesting that he admitted that he was going to commit perjury. No, no. I was simply saying that an inference can be made where counsel says, I believe you're going to commit perjury, and he said, I'm not going to tell you what I'm going to testify to, and that he was going to dare her to refuse to participate in his testimony, that I think an inference can be made under those circumstances that he might be committing perjury, and she certainly had a good faith belief that he was going to commit perjury. But what should she have done? That all comes after the fact in the letter. What should she have done under California law or U.S. law, Supreme Court law, to persuade the trial court? I mean, she has some obligation to advise the court, doesn't she? Well, I think you're relying on what she says after. All we have to go on is what she laid the foundation for during trial is a lot sparser. You're right, Your Honor. And certainly it's not as clear at trial, but it was clear that she believed he was going to commit perjury and that the trial court understood that the reason she was not questioning him was for this reason. Granted, she did not lay a firm factual basis, as some courts have required, to show why she believed he would commit perjury. But I would submit that that is not particularly relevant here where under the AEDPA we're examining whether we have a contradiction or unreasonable application of Supreme Court precedent. And the Supreme Court has never said, the United States Supreme Court has never said that there must be some firm factual basis. What we have here is an attorney who had a good faith belief that her client was going to commit perjury. And under NICS, the white side where the Supreme Court says an attorney has an obligation not to participate when she believes there's going to be perjury. I don't believe that there was any violation of Supreme Court precedent here. How was the defendant in this case prejudiced? If we assume for a moment that your opposing counsel is correct, at least in that no appropriate foundation or knowledge was laid before she refused to question him. How was he prejudiced in this case, if at all? Well, I simply think he cannot show he was prejudiced. He got on the stand and he told his story. He claimed that essentially he had no participation in the criminal acts. He was in the shower at the time they occurred. It would be pure speculation to conclude that eliciting questions by counsel of the defendant or Petitioner would have made a difference. In fact, this letter states that he didn't tell her what he was going to testify to. So she would have been asking him questions blindly. And under those circumstances, it's simply impossible to conclude that his testimony would have been substantially different, much less would have affected the outcome of the case. And just very briefly with respect to the issue regarding compelling of wearing prison clothes, it's – I believe here the State courts cited the appropriate law and acknowledged that, in fact, a defendant can't have constitutional rights violated if he's forced to wear jail clothes at trial. So – but the State court concluded that he wasn't so compelled. And the question here was whether there was really an unreasonable determination of the facts presented in the State court proceedings. And in making that evaluation, the question is not whether some court might possibly disagree or come to a different conclusion, but the conclusion must be unreasonable. And given the minute order in this case before the first trial where Petitioner was representing himself and where the trial court specifically advised him that the we can conclude that the State court unreasonably determined the facts in finding that he wasn't compelled to wear prison clothes. He was told that prison clothes were available. He apparently did not avail himself of that option. Apparently he did, according to your opposing counsel, in the first trial, he did avail himself of the clothing. What happened at the second trial that changed things? Well, it's unclear. But I don't think the record is terribly clear as to what happened in the first trial. But even assuming he did avail himself of that, I think that supports the notion that, in fact, he knew of this option and he must have made some decision not to wear these clothes. May. We don't know. I'm not sure. Didn't he object? Are you saying there was no objection at the second trial? No. He objected. But he didn't avail himself then. Well, he never. There's no indication in the record that he asked for the courthouse clothing or that that's what he had wanted. Even though, apparently, he was aware of and... Where would it have come from? The courthouse clothing? Yeah. You said there was courthouse clothing. He objected to having to wear jail clothing in the second trial. So where would it have come from? Well, if I understand... As I understand it, you're saying it's available in the courthouse. There's some argument as to whether it's available in this particular trial judge's courtroom, but the question is if he said, I object to wearing prison garb, where, after he does that, where's the burden lie to provide him with civilian clothes? He has to go out and get his family to bring him in? Well, there was some discussion about having his family bring in clothes, and apparently that's what he wanted. Now, the record is not terribly clear. Perhaps he didn't want to wear the courthouse clothing. Perhaps he wanted his own clothes from home, and that's what the discussion was about or the complication was about. And, granted, the court did not specifically advise him at the second trial that this courthouse clothing was still available. But I think an inference can be made that he was still aware of that option, and apparently he chose not to avail himself of it because he didn't ask for that clothing, notwithstanding the fact... Whose burden is it in this instance? Is it the defendant's burden or the government's burden? Burden to provide... In this case, the defendant's saying he raised, he made the request to have the clothing. He didn't get it. Does he have to do something more to show that his constitutional rights were violated, or is that sufficient? Or is it the government's obligation, If he raises the question to come forward with the clothing, whose burden is it? Well, I think when he asked for clothing, there has to be the government has to make an effort to provide him that clothing. And did they do that in the second trial? Well, it's from the record, it appears that he had been told that this clothing was available, and he never made a request for this courthouse trial clothing. Now, maybe the question here is that the record is not as clear as it could be. Ideally, there would have been a record made, you know, defendant, Petitioner has declined the courthouse clothing even though it's been made available to him. The record, granted, is quite unclear, but the record does show that he was told that this clothing was available at least before the first trial. But I would just very briefly like to move on, if I may, to the... I'd like to pin that down there, because it's clear there was a long discussion in front of this judge, and the judge basically said it was your problem, your family should have brought it. Well, I think what happened was that counsel had indicated that as far as getting clothing from the family, that she had made efforts to get him this clothing, that he brought this up on the morning of trial when the record shows there were avenues for him to obtain this clothing that he did not avail himself of, in particular. But what this says is, this is his counsel, right, saying, at ER-247, he says this is for his being in jail clothing, he was told it was going to be his trial date today to have his family here with clothes. And it was told again this morning in court. Now, he's complaining because they haven't had any conversation. This is his conflict with his counsel that he says he's got. But anyway, this is his counsel saying this. I verified that he would have access to a telephone so he could get somebody here with clothes. Nobody has been here. I know he has family members. They've come to court, but they've never spoken to me. It doesn't sound like she's taken any. I don't know if they declined to speak to her or what. It doesn't sound like there's a very good relationship here. And he says, my phone's blocked at home. I can't call from court. And the court says, have you thought about writing a letter? And that's the end of it. Is that what the due process? Well, I. . . It's too bad. You had a shot. And you started off. . . Well, I. . . Well, again, I don't think it was that. . . Again, the record is unclear. I don't think the court said, no, we're not going to take the time for you to get the courthouse clothing. And I think perhaps there was not an adequate record made to determine exactly what happened. And it's possible from this record that what had happened was that the trial judge and counsel were aware that he had been given this option for trial clothing in the first trial. That's not answering my question. I think it's quite clear what happened. The record is right here in front of us. There was a discussion about it, and the trial judge said, you had a shot at getting it through your family. If you couldn't use the phone, you could have done it by mail. End of discussion. Is that sufficient under the 14th Amendment? Well, no. I don't agree it's sufficient for a trial court simply to say you had your chance and that's it. And I think that obviously the court has to ensure that the rights are protected. And I think that probably the court should have made a better record with regard to this availability of courthouse clothing. Well, that really gets back to the point I was raising before in terms of the burden. This defendant objected in the second trial to his being tried in prison garb. The court didn't say, you know, we'll take a 15-minute recess while you go get your clothing that you used in the first trial, or let's wait for your family to bring the prison garb. He just said, yeah, you know, you had this opportunity, goodbye. I'm interested in your view as to whether that is sufficient to satisfy Estelle v. Williams. Well, I think that under Estelle, the Supreme Court said that a criminal defendant can't be compelled to wear prison clothing. So the question is, given a particular record, whether or not it shows that he was in fact compelled. In this case, though, as was just indicated by Judge Fischer, he asked. He asked for the clothing. The court denied that, in effect. Do you disagree with that? Well, I disagree that the court denied access to the courthouse clothing. Well, how would you characterize this? What did the court do in this case with respect to the response or the inquiry by the defendant? He wanted the clothes. What did the court do? Well, the court did question him and asked him about, you know, access to family members. Okay. I understand the family part. But is it the government's position that a defendant has an obligation to have a family member bring clothing if it's not available at the courthouse in order to satisfy this constitutional requirement? No, that's not the government's position.  So let's eliminate the family part. What about the clothing that was there at the courthouse? What did the court say, if anything, about that in the second trial? The court didn't say anything. And I would agree if a criminal defendant wants that clothing, it must be made available to him. And he seems to have asked for it, right? Well, it's unclear whether he was asking for that courthouse clothing or not. I thought it was very clear. Well, it seems to me that he said, I don't want to be wearing prison garb. That's pretty clear, isn't it? Well, it's he never requested the courthouse clothing, and I would agree. Well, does he have to say, I like that suit I wore in the first trial, I want that suit? No. Or is it sufficient to say, I don't want to be tried in these prison clothes? Well, I would agree with the Court that the trial court should have made a better effort here as far as offering the courthouse clothing. But if I could just briefly move on as far as the prejudice standard here. The question is prejudice under the Brecht standard. And as the Court, as I pointed out in the brief, the trial court here very specifically admonished the jurors during voir dire that the fact that the defendant was wearing prison clothes was not evidence of anything, certainly wasn't evidence of guilt any more than the charges were. That they were not to consider that evidence of guilt. And so I think that that instruction clearly helped reduce any possible prejudice that could have occurred. In addition, the jurors knew that Petitioner was in custody. Lots of evidence came. I think we're well over time, so I think we have your argument. Thank you, Your Honors. He took up more of his time over time, so you can have a minute on rebuttal. Your Honor, on the jail clothing, clearly, Mr. Wilkins could not have simply gone walking the corridors of the courthouse looking for this clothes. What about the prejudice point? The prejudice, Your Honor, the evidence against Mr. Wilkins was not overwhelming here. What about the mitigating aspect? Well, it was what the judge said, look, you know he's in custody. It doesn't you can't take that into account. There was certainly an initial discussion at the beginning of voir dire. It's not clear from the record because the full jury selection was not transcribed. It went over two days. It's not clear that everyone that made it onto the jury pool actually heard that initial discussion that was given to the 14 that were in the box initially. So that's not clear. But clearly, the evidence here was not overwhelming. Understand, the first trial resulted in a hung jury. So we already know the evidence here was not necessarily overwhelming. Mr. Libby, does the record have to show that he was compelled to wear? That he was? That he was compelled to wear jail attire? Well, I believe he was compelled because he asked. No, that's a yes or no. Does the record have to show that he was compelled to wear, jury? Certainly, which I believe it does, Your Honor. He was compelled based on, as this Court has said, if he asked for it and he's indigent, the Court has to provide it. And if the Court doesn't provide it, then that's compulsion. And that's what occurred here. He was aware that there was civilian clothing available. He asked the Court before his trial began here not to appear in prison garb. He said, I don't want to appear in prison garb. He objected. The State court even acknowledges, yes, he objected. He didn't want to appear in prison garb, yet the Court did not provide the clothing to him. It was not Mr. Wilkins could not have gotten the clothing. Only the Court could have provided the clothing. And the Court didn't do that. That's compulsion. That's what your view of this record is? It is, Your Honor. Thank you. And I thank the Court. All right, counsel. We appreciate the argument. The case is submitted.
judges: Farris, Fisher, M. Smith